IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:25-cr-64 |
| | ) | |
| BRIAN KEITH ANDERSON | ) | |
| | ) | |
| *Defendant.* | ) | |

**THE UNITED STATES RESPONSE TO
DEFENDANT'S OJECTIONS TO THE PRESENTENCE REPORT**

The United States of America, through undersigned counsel, submits the following response to the defendant's motions and objections to the Presentence Investigation Report. *See* ECF Nos. 33, 34. Having reviewed defendant's motions, the United States believes that the application of the "maintaining premises" enhancement is applicable to the defendant and should be applied by this Court. U.S.S.G. § 2D1.1(b)(12). Further, the United States believes that the facts underlying this case do not warrant the application of the minor role adjustment. U.S.S.G. §§ 3B1.2(b), 2D1.1(e)(2). Therefore, the United States respectfully requests that this Court deny both motions and sentence the defendant to 150 months imprisonment.

**Background**

Beginning in January 2024, and continuing through and including February 2025, law enforcement conducted seven controlled purchases of methamphetamine from the defendant. Each controlled purchase was conducted at the defendant's residence, where surreptitious recordings – captured by confidential informant(s) – showed that the defendant was also storing the methamphetamine inside the residence. Over the course of the investigation, the defendant

1

distributed 117.29 grams of methamphetamine with purity levels ranging above 90% purity. Three of the controlled purchases involved amounts in excess of 27 grams of methamphetamine. *See* ECF No. 24. On March 5, 2025, a search warrant was executed on the defendant's residence and vehicle at which time the following items were recovered: $1,160 in United States Currency; nine firearms, including various firearm magazines and ammunition; two digital scales containing methamphetamine residue; one square tab containing Lysergic Acid Diethylamide (LSD); and a black Samsung cellular phone.

On April 16, 2025, a grand jury sitting in the Eastern District of Virginia returned an eight-count indictment. ECF No. 13. Count one charged the defendant with conspiring to distribute fifty grams or more of a mixture and substance containing a detectable mount of methamphetamine. Counts two through seven charged the defendant with distribution of methamphetamine. And Count eight charged the defendant with selling a firearm to a felon. *Id.* On July 23, 2025, the defendant pled guilty to Counts two through eight. ECF Nos. 22-24.

## ARGUMENT[1]

### A. The Probation Officer Did Not Err In Applying The "Maintained A Premises" Enhancement.

Section 2D1.1(b)(12) of the United States Sentencing Guidelines provides that "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase [the base offense level] by 2 levels." *Id.* The application notes provide that the enhancement applies "to a defendant who knowingly maintains a premises (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1 cmt. n. 17. In

---

[1] The United States intends to present evidence in support of its position at the defendant's sentencing hearing.

determining whether the premises was "maintained" for that purpose a court should consider "(A) whether the defendant held a possessory interest in (*e.g.*, owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." *Id.* Further, "[m]anufacturing or distributing a controlled substance need to be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than on of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id.*[2]

Here, the defendant asserts that he did not maintain a premises for the purpose of distributing a controlled substance because the primary use of the premises was as his residence, and his distribution of meth was incidental to that primary purpose. *See* ECF No. 33, p. 5. However, as the Fourth Circuit has made clear, "[i]t is possible for a personal residence to have a secondary primary purpose of drug distribution." *United States v. Smith*, 721 F. App'x. 292, 293 (4th Cir. 2018) (per curiam) (citing *United States v. Bell*, 776 F.3d 634, 638 (6th Cir. 2014) and *United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012)); *accord United States v. Saxby*, 754 F. App'x. 161, 164 (4th Cir. 2018) (per curiam) (finding that the district court did not err in applying the premises enhancement where the defendant "conceded that he held a possessory interest in his

---

[2] The defendant asserts that "the Court may only consult the Commentary if the Court finds that the main text of the enhancement is 'genuinely ambiguous,' and that the Commentary is a reasonable interpretation thereof." ECF No. 33, p. 4 (citing *United States v. Roney*, No. 3:24-cr-113, 2025 WL 2533193, at *8 (E.D.Va. Sept. 5, 2025)). However, the Fourth Circuit held in *United States v. Mitchell*, 120 F.4th 1233, 1241 (4th Cir. 2024), that even if the "commentary is not owed *deference* where the Guideline is unambiguous does not, however, mean that courts must entirely ignore the commentary. 'Rather, commentary explains the guidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice.'" *Id.* (emphasis in the original) (citing *Stinson v. United States*, 508 U.S. 36, 44 (1993)).

residence and controlled access to it, and he directed an undercover law enforcement officer to purchase controlled substances from his residence[,]" despite "the fact that only three documented drug transactions occurred at the house[.]"); *United States v. Flores-Olague*, 717 F.3d 526, 532 (7th Cir. 2013) ("[A]n individual maintains a drug house if he owns or rents premises, or exercises control over them, and for a sustained period of time, uses those premises to manufacture, store, or sell drugs, or directs others to those premises to obtain drugs." (internal quotation marks omitted)); *United States v. Esteras*, 102 F.4th 98, 105 (2d Cir. 2024) (holding that it is "entirely possible for a dwelling to be primarily used as *both* a residence and a narcotics distribution point." (emphasis in original) (internal quotation marks omitted)); *United States v. Melendez-Rosado*, 57 F.4th 32, 38 (1st Cir. 2023) (holding that "a premises that principally serves as a family residence may also principally serve as a site for the manufacturing or distribution of a controlled substance.").

In *Bell*, the Sixth Circuit concluded that "precedents under the guideline do not carve out residences as safe haven from being drug-production premises." 766 F.3d at 638 (citation omitted). In reaching this conclusion, the court stated that "[o]ne can maintain a premises for more than one purpose.  An individual may live there and maintain an office there.  An individual may live there and rent out a room or two there.  And an individual may live there and cook crack cocaine or methamphetamine there." *Id.*   "[T]he question is whether [the defendant's] home 'played a significant part' in distributing drugs." *Id.* at 637 (citing *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013)).  While the court found that Bell "had no job other than cooking crack cocaine and selling it[,]" the Court looked to other indicia of distribution noting that "the house contained the tools of the trade," which supported the enhancement. *Id.* (internal quotation marks and citation omitted).  The court detailed the presence of a digital scale; drug packaging material; a police

scanner; $4000 in United States currency; and firearms, which were located inside the defendant's vehicle – parked in the garage. *Id.*, *see also United States v. Moore*, 553 F. App'x. 345, 346 (4th Cir. 2014) (per curiam) (finding that the evidence supported the inference that the defendant maintained and/or controlled his trailer for the purpose of storing and manufacturing drugs for distribution – noting the presence of scales, plastic baggies, "cooking" apparatus, a crack pipe, and firearms).

Similarly, in *Miller*, the Eight Circuit stated that "[w]hen the premises in question was the defendant's family home, by definition it was used for that lawful purpose 100% of the time[,]" however, if the defendant also "uses the premises for the purpose of substantial drug-trafficking activities," the enhancement still applies. 698 F.3d at 707. There, the court found that Miller's "active[] participat[ion] in at least three controlled buys on the property, and . . . accepting payments she knew were for methamphetamine purchases on other occasions[,]" were "activities [that] were more than [] 'incidental or collateral' use of the premises[.]" *Id.* at 706.

Here, the United States does not dispute that the defendant utilized the home at 150 Pecan Road, Dunnsville, Virginia, as his primary residence. However, that is not the question. "[T]he question is whether [the defendant's] home 'played a significant part' in distributing drugs." *Bell*, at 637. And the answer to that question, in this instance, is yes.

During a period of fourteen months, law enforcement conducted seven controlled purchases from the defendant. In each instance, the defendant directed the confidential informant(s) ("CI") to his residence as 150 Pecan Road, to conduct the drug transactions. During those transactions, the defendant charged between $28 and $100 for each gram of methamphetamine depending on how much was being purchased at one time. For instance, on January 16, 2024, the defendant charged $100 for approximately 1.3 grams of methamphetamine.

And on February 21, 2024, the defendant charged $1000 for approximately an ounce of methamphetamine. Additionally, during the execution of the search warrant on March 5, 2025, law enforcement located "tools of the trade" – $1,160 in United States Currency; nine firearms, including various firearm magazines and ammunition; two digital scales containing methamphetamine residue; one square tab containing Lysergic Acid Diethylamide (LSD); and a black Samsung cellular phone. Taken together, the evidence supports the inference that the defendant maintained the premises for the purpose of distributing methamphetamine – thus, the enhancement was properly applied.

## B. The Probation Officer Did Not Err In Concluding That The Minor Role Reduction Is Not Applicable Based On The Defendant's Conduct.

Section 3B1.2(b) of the Guidelines provides that the Court may decrease a defendant's offense level by 2 levels, if the Court determines that the defendant "was a minor participant in any criminal activity." *Id.* In determining whether the adjustment should apply, the court must not "only look at the defendant's conduct relative to [] other defendants, but also at his or her conduct relative to the elements of conviction." *United States v. Akinkoye*, 185 F.3d 192, 202 (4th Cir. 1999), *cert. denied*, 528 U.S. 1177, 120 S.Ct. 1209 (2000). However, it is the defendant who must prove by a preponderance of the evidence that he is entitled to a mitigating role adjustment. *Id.*

Under the application notes for §3B1.2, the reduction "applies to a defendant described in Application Note 3(A) who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal. §3B1.2 cmt. n. 5. Application Note 3(A) states:

> This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity.
>
> A defendant who is accountable under §1B1.3 (Relevant Conduct) only for conduct in which the defendant personally was involved and who performs a limited function in the criminal activity may receive an adjustment under this guideline.

6

*Id.*

Application Note 3(C) provides a "non-exhaustive list of factors" that the court should consider, such as:

(i)    the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)   the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)  the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)   the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)    the degree to which the defendant stood to benefit from the criminal activity.

*Id.*

Further, section 2D1.1(e)(2)(B) provides, that in addition to the factors cited above, "an adjustment under §3B1.2 is generally warranted if the defendant's primary function in the offense was performing a low-level trafficking function." *Id.* The section then provides examples such as "serving as a courier, running errands, sending or receiving phone calls or messages, or acting as a lookout; or . . . distributing controlled substances *in user-level quantities for little or no monetary compensation or with a primary motivation other than profit.*" *Id.* (emphasis added). In providing an example of the type of defendant this section is designed to address, the application notes describe a defendant who was *otherwise unlikely to commit such an offense* and was *motivated by an intimate or familial relationship, or by threats or fear to commit the offense.* (emphasis added). None of these examples are applicable in the defendant's case.

The defendant distributed methamphetamine seven times over the course of fourteen months. Prior to the first controlled purchase, he was known to law enforcement as a suspected drug distributor. Further, in each instance, he dictated the price and the location for the transactions. And his residence contained "tools of the trade" consistent with distribution. *See Bell*, 766 F.3d at 637. At no point does the evidence support that the defendant was serving as a courier, running errands, or acting as a lookout. Neither does it support that the defendant was distributing user-level quantities for little or no monetary compensation or with a primary motivation other than profit. Instead, the defendant was selling distribution amounts of methamphetamine. *See e.g.*, *United States v. Batts*, 661 F. App'x. 787, 790 (4th Cir. 2016) (finding no error in allowing non-expert testimony that 8.21 grams of crack was a distribution amount); *United States v. Dennis*, 19 F.4th 656, 666 (4th Cir. 2021) (concluding that 33 grams of heroin afforded the jury a reasonable ground to conclude the drug was not for personal use); *United States v. Brown*, 3:17-cr-62, 2021 WL 1724932, *1 (E.D. Va. Apr. 30, 2021) (describing 19.15 grams of cocaine hydrochloride and 14 grams of cocaine base as distribution amounts). And he was charging prices that fall well above the national average. *See Public Hearing on Methamphetamine: Hearing Before the U.S. Sentencing Comm.* (August 5, 2025) (statement of Jonathan Caulkins, Professor, Carnegie Mellon University's Heinz College), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20250805/Caulkins.pdf (Average prices of methamphetamine: $46.44 a gram; $29.75 for 3.5 to 3.6 grams; $11.49 per ounce). Moreover, the defendant was not selling to a lone CI. Throughout this investigation law enforcement used two separate CIs to purchase from the defendant. Additionally, during at least one of the video recordings – captured by the CI – the

defendant is observed selling suspected methamphetamine to another individual who states that he plans on reselling it for a higher price.

Here, the evidence does not support the minor role reduction, and the defendant cannot meet his burden to establish that he is entitled to it.  Therefore, the United States request that the Court deny applying it in this instance.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court deny the defendant's motions.

Respectfully submitted,

LINDSEY HALLIGAN
United States Attorney

By:             /s/
Eric Gilliland
Virginia Bar No. 95796
Special Assistant United States Attorney
United States Attorney's Office
Suite 1900
919 East Main Street
Richmond, Virginia 23219
Tel.: (804) 819-5416
Fax: (804) 771-2316
Eric.Gilliland@usdoj.gov